## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M.A.,<br><br>               *Petitioner*,<br><br>   v.<br><br>STEPHEN KURZDORFER, in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; JOSEPH FREDEN, in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility; TODD LYONS, in his official capacity as Acting Director U.S. Immigrations and Customs Enforcement; and KRISTI NOEM, in her official capacity as U.S. Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATIONS AND CUSTOMS ENFORCEMENT,<br><br>               *Respondents*. | Case No. _____<br><br>**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS** |

## **INTRODUCTION**

1.    This case concerns the illegal prolonged detention of Petitioner J.M.A.,[1] a New York resident and citizen of Cuba. Until February of this year, J.M.A. had been lawfully living and working in the United States with a pending application to remain here as a lawful permanent resident. At every stage of the immigration process he has done everything that the government has asked of him. Despite this, J.M.A. has been incarcerated at a federal immigration detention

---

[1] J.M.A. is seeking to proceed with initials to protect his identity because he is seeking asylum from Cuba. A motion to proceed with initials and to file exhibits with identifying information under seal or in the alternative with redactions will follow the filing of this petition.

facility for over seven months. His ongoing detention violates the Due Process Clause of the United States Constitution.

2.      In June of 2023, J.M.A. entered the United States seeking asylum due to his serious fear of persecution for his staunch anti-communist beliefs in Cuba. J.M.A. has since been well on his way to securing lawful permanent resident status pursuant to the Cuban Adjustment Act ("CAA") and, through that process, has obtained work authorization and a Social Security number. In October of 2024, the government filed a motion to dismiss J.M.A.'s removal proceedings because he "is prima facie eligible to apply for adjustment of status under the Cuban Adjustment Act at USCIS." The Immigration Court promptly granted the motion on the same date.

3.      Prior to his detention, J.M.A. had been working, living with extended family, and integrating into the community in his new home in Western New York. Then, in February of 2025, J.M.A. was erroneously arrested and charged with misdemeanor theft at a shopping mall. Local police then unlawfully transferred him to federal immigration custody. Though these criminal charges have since been dismissed. J.M.A. remains in immigration detention at the Buffalo Federal Detention Facility in Batavia, New York ("BFDF"). He has never been provided with a bond hearing.

4.      Once in immigration detention, and despite his pending application for relief under the CAA, the government attempted to hastily and summarily deport J.M.A. as part of the Trump Administration's dramatic and unlawful expansion of its use of expedited removal.[2] However, an

---

[2] *Make The Rd. New York v. Noem*, No. 25-CV-190, 2025 WL 2494908, at *3 (D.D.C. Aug. 29, 2025) (granting a nationwide stay of the expansion of expedited removal to noncitizens living in the interior of the country who had not previously been subject to expedited removal); *see also Coal. for Humane Immigrant Rts. v. Noem*, No. 25-CV-872, 2025 WL 2192986, at *2 (D.D.C. Aug. 1, 2025) (granting a nationwide stay of the government's action to subject noncitizens paroled into the United States to expedited removal); *Doe v. Noem*, 778 F. Supp. 3d 311, 336-37 (D. Mass. 2025) (holding that the INA does not permit the government to subject noncitizens paroled into the United States to expedited removal).

immigration judge ("IJ") found, contrary to the government's initial cursory finding, that J.M.A. had demonstrated a credible fear of return to Cuba, permitting him to pursue that asylum claim in Immigration Court. If J.M.A. does not prevail before an IJ then he will continue to file an appeal with the Board of Immigration Appeals ("BIA") and, if necessary, United States Court of Appeals for the Second Circuit.

5.      Every day that J.M.A. remains in detention subjects him to further irreparable harm. He is separated from his loved ones and his community and is unable to work. He is not a flight risk nor a danger. Rather, he is a contributing member of the Buffalo community whose only arrest was promptly dismissed and who has two bona fide claims to remain in the United States – his asylum claim and his pending CAA application. Immediate relief is necessary to release him from his unlawful detention as he continues to pursue his pending asylum claim and awaits action on his adjustment of status application.

## PARTIES

6.      Petitioner J.M.A.is a Cuban national and asylum seeker who has been in the United States since June 9, 2023. He is seeking asylum in the United States due to a credible fear of persecution in Cuba and has a pending application for adjustment of status pursuant to the CAA. He has been in ICE custody since February 9, 2025, and is currently incarcerated at BFDF.

7.      Respondent Stephen Kurzdorfer is sued in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement ("ICE"). Respondent Kurzdorfer is a legal custodian of J.M.A.

8.      Respondent Joseph Freden is sued in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility. Respondent Freden is a legal custodian of J.M.A.

9.     Respondent Todd Lyons is sued in his official capacity as Acting Director of U.S. Immigrations and Customs Enforcement. As the Acting Director of ICE, Respondent Lyons is a legal custodian of J.M.A.

10.    Respondent Kristi Noem is sued in her official capacity as Secretary of Homeland Security. As the head of the Department of Homeland Security ("DHS"), the agency tasked with enforcing immigration laws, Secretary Noem is J.M.A.'s ultimate legal custodian.

## STATEMENT OF FACTS

11.    J.M.A. is a citizen of Cuba and a resident of Buffalo, New York who came to the United States from Cuba to seek safety from persecution by the communist government in Cuba. J.M.A. has a credible fear of persecution in Cuba and has sought asylum in the United States on that basis.

12.     On June 9, 2023, J.M.A. arrived at the Calexico West Port of Entry pursuant to a scheduled appointment obtained via the official CBP One Mobile Application ("CBP One App"). Ex. A to Gillman Decl. at 2.[3] CBP officers took him into custody, interviewed him, and immigration violation and criminal history checks both produced negative results. *Id*. He was then released and served with a Notice to Appear ("NTA") before an IJ at 130 Delaware Avenue, Room 300, Buffalo, New York, 14202 on October 23, 2023. *See* Ex. B to Gillman Decl. at 1. J.M.A. then traveled to Buffalo, New York where he has family and friends.

13.    On October 23, 2023, J.M.A. appeared before the immigration court as directed and received another hearing date. Prior to his next scheduled court date, J.M.A. began the process of applying to become a legal permanent resident pursuant to the CAA.

---

[3] A motion to proceed with initials and to file all exhibits with identifying information under seal or, in the alternative, with redactions will follow the filing of this petition and will be accompanied by all referenced exhibits in this petition.

14.     J.M.A. was subsequently issued a social security number and granted work authorization.

15.     On October 8, 2024, prior to his next scheduled immigration court date, the Department of Homeland Security ("DHS") filed a motion to dismiss the immigration removal proceedings on the basis that J.M.A. "is prima facie eligible to apply for adjustment of status under the Cuban Adjustment Act at USCIS." Ex. C to Gillman Decl. at 2. On the same day, the immigration court granted the motion to dismiss. Ex. D to Gillman Decl.

16.     After his removal proceedings were dismissed, J.M.A. waited for his CAA application to be processed by the United States Citizenship and Immigration Services ("USCIS"), complied with all application requirements—including the submitting of biometric information—and continued to build a new life in the United States while working and living in Western New York.

17.     However, on February 8, 2025, J.M.A. was wrongfully arrested while shopping at a Macy's department store in the Buffalo area. A security guard in the store accused J.M.A. of attempting to shoplift a belt he had been holding. J.M.A. explained that he was shopping and hoping to purchase the belt. Upon information and belief, the security guard nonetheless contacted the local police department who came to the Macy's.

18.     J.M.A. was then transported to the Cheektowaga police station where he was booked at roughly 8:00 PM and told he should expect to be released within an hour. He was charged with petit larceny – a misdemeanor offense.

19.     Just before J.M.A. was to be released, he heard one police officer tell another police officer that he could not release J.M.A. yet because "for noncitizens" he needed to "make a call."

J.M.A. pleaded with the officer to let him go, but the officer told him he needed to call border patrol pursuant to his supervisor's instructions to "call border patrol for noncitizens."

20.    In New York, municipal law enforcement officials lack legal authority to detain individuals for civil offenses without a warrant, including federal civil immigration offenses. *See People ex rel. Wells v. DeMarco*, 168 A.D.3d 31 (2d Dept. 2018). This includes holding people beyond when they would otherwise have been released from criminal custody so that immigration authorities can arrive to detain them. *See generally id.*

21.    A Customs and Border Patrol agent responded to the call and arrived at the Cheektowaga police station at or around 10:30 PM, arrested J.M.A. and transported him to a Border Patrol Station. Ex. E to Gillman Decl. at 3. J.M.A. explained to the federal officers – to no avail – that he had an active, pending adjustment application and should therefore not be detained.

22.    The next day, February 9, 2025, J.M.A. was transported to BFDF, where he is currently detained.

23.    Due to J.M.A.'s detention at BFDF, he was assigned criminal defense counsel after a significant delay, after which his counsel had to coordinate with the ICE to arrange appearance in criminal court. When he was finally able to appear in criminal court on June 23, 2025, the charges were dismissed. Ex. F to Gillman Decl.

24.    After being taken to BFDF following his arrest, J.M.A., without counsel, was issued a new NTA, placing him back into immigration removal proceedings. Ex. G to Gillman Decl.

25.    On March 25, 2025, J.M.A. appeared *pro se* for a master calendar hearing (status hearing-non-final merits hearing) before the immigration court in that is located in the BFDF. Prior to the March 25, 2025, hearing date, an attorney for DHS filed a written motion to terminate removal proceedings.  Ex. H to Gillman Decl. An IJ granted the motion at the March 25 hearing,

without the government or the IJ explaining the motion or giving J.M.A. a meaningful opportunity to oppose it.

26.    The next day, J.M.A. was placed into expedited removal proceedings[4], and referred for a credible fear interview that took place on March 31, 2025. Although the asylum officer found JMA's responses credible, he issued a negative credible fear determination. J.M.A. requested a review of the asylum officer's negative credible fear determination before an IJ.

27.    On April 3, 2025, RFK Human Rights entered an appearance on behalf of J.M.A. RFK Human Rights filed an appeal with the BIA of the immigration court's granting of the DHS's motion to terminate removal proceedings and prepared a submission in support of the Immigration Judge's review of the negative credible fear determination.

28.    On April 7, 2025, an IJ reversed the negative fear determination. As a result of this reversal, J.M.A.'s immigration case was returned to regular removal proceedings before the immigration court—in the same posture that he was in before the immigration court dismissed proceedings in October of 2024.

29.    On April 14, 2025, J.M.A., by and through counsel, submitted a request for release with ICE.

30.    On April 25, 2025, ICE denied his request for release.  Ex. I to Gillman Decl.

---

[4] Expedited removal is a streamlined removal process that strips noncitizens of their ability to seek immigration relief through traditional removal proceedings under 8 U.S.C.A. § 1229a and is devoid of many of the procedural safeguards offered to noncitizens through § 1229a and permits summary deportations of noncitizens. *See* 8 U.S.C. § 1225 (expedited removal statute); *Coal. for Humane Immigrant Rts. v. Noem*, 2025 WL 2192986 at *3-6) (explaining expedited removal). "In January 2025, the Government expanded the scope of expedited removal to noncitizens apprehended anywhere in the United States." *Make The Rd. New York v. Noem*, 2025 WL 2494908 at *1). The government attempted to summarily deport J.M.A. pursuant to this now stayed illegal expansion of summary deportations through expedited removal.

31.    On May 3, 2025, DHS and RFK Human Rights filed with the BIA a joint motion to remand the case to the immigration court so that J.M.A. could apply for all available and appropriate forms of relief. The BIA granted the joint motion to remand.

32.    On June 5, 2025, J.M.A. and counsel from RFK Human Rights appeared at the first master calendar hearing following the BIA remand. The IJ who is assigned to J.M.A.'s asylum case is the same IJ who granted the DHS motion on March 25, 2025.

33.    At the June 5 hearing, counsel from RFK Human Rights informed the IJ that J.M.A. has a pending application with USCIS to adjust status under the CAA. The Immigration Judge was surprised about this fact given that it was not disclosed by DHS at the time J.M.A. appeared pro se before the immigration court on March 25, 2025. The IJ stated that if J.M.A. had a pending application to adjust status under the CAA, he should not have been put into expedited removal proceedings. The IJ asked the DHS attorney if he agreed with that analysis and the DHS attorney concurred and noted that he had not filed the motion to terminate.

34.    As is set forth *supra,* on June 23, 2025, J.M.A.'s criminal charges were dismissed. J.M.A. has no other arrests or convictions in the United States.

35.    On July 7, 2025, J.M.A., by and through counsel, provided ICE with an update that his criminal case had been resolved through a dismissal of all charges and provided proof thereof. J.M.A., by and through counsel, requested reconsideration of the denial of release by ICE in April. ICE again denied release.

36.    On July 17, 2025, J.M.A. appeared with counsel from RFK Human Rights for his individual merits hearing on his application for asylum, withholding of removal and deferral under the United Nations Convention Against Torture. J.M.A.'s case did not conclude on that date and

was adjourned to September 11, 2025. On September 11, 2025, J.M.A.'s asylum case again did not conclude and was adjourned to November 10, 2025.

37.    J.M.A. also continues to wait for an adjudication of his pending CAA application.

## ARGUMENT

### *Due Process Prohibits the Unreasonable Prolonged Detention of J.M.A.*

38.    J.M.A. has been detained by the federal government pending the conclusion of his removal proceedings for over seven months and with no end in sight. J.M.A. is a working member of the Buffalo community and has no criminal convictions or pending criminal charges. He is not a flight risk nor a danger to the community. The government's unreasonable and prolonged detention of J.M.A. violates his constitutional right to due process.

39.    "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint— lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Unquestionably, "the Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020). "Where an individual's liberty is at stake, the Supreme Court has consistently used [a clear and convincing evidence] standard for continued detention." *Black v. Decker*, 103 F.4th 133, 157 (2d Cir. 2024).  Immigration detention is civil and therefore to remain "nonpunitive in purpose and effect" the detention must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]." *Zadvydas*, 533 U.S. at 690 (cleaned up). Therefore, "as the Supreme Court recognized in *Zadvydas*, 'a statute permitting indefinite detention of an alien would raise a serious constitutional problem.'" *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas*, 533 U.S. at 690) (cleaned up).

40.    The Second Circuit has repeatedly found that the Constitution prohibits prolonged detention of noncitizens. In *Velasco Lopez*, the court held that a noncitizen discretionally detained

pursuant to 8 U.S.C. § 1226(a) "was denied due process because he was incarcerated for fifteen months (with no end in sight) while the Government at no point justified his incarceration." 978 F.3d at 846. Likewise, in *Black*, the court held "that a noncitizen's constitutional right to due process precludes his unreasonably prolonged detention under section 1226(c) without a bond hearing." 103 F.4th at 138. These constitutional decisions followed the Second Circuit's decision in *Lora v. Shanahan* which "cautioned . . . that 'serious constitutional concerns' would arise absent 'some procedural safeguard in place for immigrants detained for months without a hearing.' *Black*, 103 F.4th at 145 (quoting *Lora v. Shanahan*, 804 F.3d 601, 614 (2d Cir. 2015) *cert. granted, judgment vacated on other grounds*, 583 U.S. 1165 (2018)). And while the Second Circuit has not yet squarely ruled on the constitutionality of the prolonged detention of noncitizens under § 1225, these precedents apply with equal force here and similarly prohibit the government from subjecting J.M.A. to prolonged detention without a custody hearing.

41.     Noncitizens like J.M.A. are afforded insufficient safeguards against unreasonable prolonged detention. Accordingly, numerous courts have found that the prolonged mandatory detention of noncitizens under § 1225(b) violates due process. *See, e.g.*, *A.L. v. Oddo*, 761 F. Supp. 3d 822, 826 (W.D. Pa. 2025) (holding that a noncitizen detained pursuant to § 1225(b) for nearly ten months without a bond hearing "is entitled to a prompt individualized bond hearing, to be governed by the same procedures provided to aliens in detention under § 1226(c)"); *Leke v. Hott*, 521 F. Supp. 3d 597, 6002 (E.D. Va. 2021) (holding that "because detention of a person without any sort of process is a deprivation of that person's bodily liberty, an arriving alien subject to prolonged and indefinite detention is detained in violation of the Fifth Amendment.") (cleaned up); *Rasel v. Barr*, 455 F. Supp. 3d 38, 45-46 (W.D.N.Y. 2020) (stating that whether the noncitizen petitioner was detained pursuant to § 1226(a) or § 1225(b) did not impact the inquiry into whether

his prolonged detention violated due process); *Bermudez Paiz v. Decker*, 2018 WL 6928794, at

*10 (S.D.N.Y. Dec. 27, 2018) (observing that "[m]ost judges who have squarely faced the question

have applied the same logic [from cases concerning prolonged detention under § 1226(c)] to §

1225(b), holding that arriving aliens, like criminal aliens, cannot be detained for an unreasonably

prolonged period of time without a bond hearing.") (collecting cases). This Court should both

recognize the precedential impact of *Black* and *Velasco Lopez* on the common issues presented by

J.M.A.'s unreasonably prolonged detention and join the other courts that have found that

unreasonable prolonged detention under § 1225(b) violates due process.

### *A* **Mathews v. Eldridge** *Analysis Shows that J.M.A.'s Prolonged Detention is Unreasonable and that his Release is Warranted.*

42.     While "any immigration detention exceeding six months without a bond hearing

raises serious due process concerns" *Black*, 103 F.4th 133 at 150, the Second Circuit has not

adopted a "bright-line rule" at which point the government's detention of a noncitizen becomes

unreasonably prolonged. *Id*.; *Velasco Lopez*, 978 F.3d at 855 n.13 (same). Instead, the three-factor

test articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976) provides the

relevant framework "to determine what process is due to noncitizens in removal proceedings"

*Black*, 103 F.4th at 147-48 (collecting cases), and confirms J.M.A.'s entitlement to a hearing where

the burden is on the government to justify his continued detention. The *Mathews* factors are: (1)

"the private interest that will be affected by the official action"; (2) "the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards"; and (3) "the Government's interest, including the

function involved and the fiscal and administrative burdens that the additional or substitute

procedural requirement would entail." *Mathews*, 424 U.S. at 335. An analysis of these factors

shows that J.M.A. is being subjected to unreasonable prolonged detention in violation of his Fifth Amendment rights.

### J.M.A. Is Experiencing a Significant Deprivation of His Liberty Interest

43.    The first factor weighs heavily in J.M.A.'s favor. "The private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Black*, 103 F.4th at 151 (quoting *Velasco Lopez*, 978 F.3d at 851). J.M.A.'s ongoing detention directly and substantially implicates this "most significant liberty interest" and, as reiterated in *Black*, "case after case instructs us that in this country liberty is the norm and detention is the carefully limited exception." *Id.* (quoting *Velasco Lopez*, 978 F.3d at 851 (cleaned up)).

44.    J.M.A. has been incarcerated at BFDF, a federal detention facility, for seven months. *Singh v. Barr*, No. 1:19-CV-01096, 2020 WL 1064848, at *10 (W.D.N.Y. Mar. 2, 2020) ("[T]he reality is that [BFDF] houses aliens against their will with various restrictions on their freedom of movement" and is not "meaningfully different from at least a low-security penal institution for criminal detention"). During this time, he has been unable to work and to see his family and friends.

45.    While each day J.M.A. spends in detention deprives him of his liberty interest, "[t]he longer the duration of incarceration, the greater the deprivation." *Velasco Lopez*, 978 F.3d at 852. Moreover, there is no end in sight to J.M.A.'s detention. As the court observed in *Velasco Lopez*, "[d]etention under § 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded. Absent release on bond, detention lasts through the initial removal determination proceedings (which themselves can take months or years) and all inter-agency and federal court appeals." *Id.* J.M.A., like all noncitizens who are detained pursuant to §

1225(b), faces the prospect of continued prolonged detention while he pursues relief from removal in immigration court. *See, e.g.*, *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1173 (W.D. Wash. 2023) (finding that asylum seekers detained under § 1225(b) "face a median time of five to six months for adjudication of their claim by an immigration judge, nearly a year for cases appealed to the BIA, and still longer for judicial review."). J.M.A.'s asylum case will continue before the immigration court until at least November 10, 2025, before he receives an adjudication and, even then, his detention could continue through appeals to the BIA and the Second Circuit.

### The Insufficient Procedures Afforded to J.M.A. Have Directly Led to an Erroneous Deprivation of His Liberty.

46.     The second *Mathews* factor also weighs heavily in J.M.A.'s favor. The erroneous deprivation of his liberty is the direct result of the insufficient safeguards and procedures used to secure his prolonged detention. "The only interest to be considered at this part of the Mathews analysis is that of the detained individuals—not the government." *Black*, 103 F.4th at 152.

47.     In *Velasco Lopez*, the petitioner was afforded multiple bond hearings in front of an immigration judge in which he bore the burden of showing he was neither a flight risk nor dangerous. *Velasco Lopez*, 978 F.3d at 847. The court found that even those procedures "markedly increased the risk of error." *Id*. at 852. Here, like the petitioner in *Black*, J.M.A. has been afforded even fewer procedural protections. Noncitizens detained under § 1225(b), like those detained under § 1226(c), have *no* opportunity to seek release before a neutral adjudicator. *See* 8 C.F.R. § 1003.19(h)(2)(i)(B) (noting an IJ "may not" conduct a custody hearing for "[a]rriving aliens in removal proceedings, including aliens paroled after arrival"). The text of the statute mandates detention "pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." § 1225(b)(iii)(IV). The limited review available is to seek release from

ICE, the agency incarcerating him. *See* 8 U.S.C. § 1182(d)(5)(A) (statutory authority for DHS to grant discretionary humanitarian parole to noncitizens). Thus because § 1225(b) detainees, like "§ 1226(c) detainees receive even less procedural protection [than §1226(a) detainees] the risk of erroneous deprivation is correspondingly greater." *Black*, 103 F.4th at 152.

48.     Moreover, mandatory detention under § 1225(b) is sweeping in scope. Like § 1226(c), the statute's "broad reach means that many noncitizens are detained who, for a variety of individualized reasons, are not dangerous, have strong family and community ties, are not flight risks and may have meritorious defenses to deportation at such time as they are able to present them." *Black*, F.4th at 152 (cleaned up).

49.     The blanket application of § 1225(b), however, is even more sweeping than that of § 1226(c). In *Black*, the court found that § 1226(c)'s requirement that noncitizens with certain serious criminal convictions was a "proxy for dangerousness," albeit a "poor" one. *Id*. Section 1225(b) however has no such limitation—it applies broadly to any noncitizens paroled into the United States.  Moreover, in a recent precedential decision, the BIA has now massively expanded Section 1225(b)'s application to any noncitizen who has, at any point, entered without inspection. *Matter of Yajure Hurtado*, 29 I&N Dec 216 (BIA 2025). This group, like parolees, includes people who have been living in the United States for decades and have no criminal history. Section 1225(b) permits the government to indefinitely detain, without individualized justification, thousands of noncitizens across the country, including those like J.M.A.: people who followed formal legal procedures to enter the country, who were inspected by federal officials at the border, who have lived freely within the interior of the United States for extended periods of time, who are working and paying taxes, and who have done everything the government has asked of them as their immigration cases proceed.

50.     In J.M.A.'s case, these deficient procedures have directly led to the continued deprivation of his liberty through unreasonable prolonged detention. J.M.A. is not a flight risk nor a danger to the community, but has had no opportunity to secure release from a neutral decisionmaker through the procedures afforded to him during his lengthy incarceration. Immigration officials had previously determined, when paroling him into the country, that J.M.A. presented neither a security nor a flight risk. Ex. A to Gillman Decl. at 2; *see* 8 C.F.R. § 212.5(b) (explaining that granting humanitarian parole to arriving noncitizens may be justified on a case-by-case basis "provided the aliens present neither a security risk nor a risk of absconding"). Since then, J.M.A. has built a life in the United States, applied for relief under the CAA for which he is prima facie eligible, Ex. C to Gillman Decl. at 2, and applied for asylum, all further entrenching his interests in continuing to appear for all required immigration proceedings. The only changed circumstance since his parole was his arrest for an alleged misdemeanor theft charge. Setting aside whether a single charge for a nonviolent misdemeanor theft offense warrants deprivation of someone's liberty, as stated above, this charge has since been dismissed.

51.     Since the beginning of his incarceration, J.M.A. has only been afforded the opportunity to seek his release through requests for discretionary parole submitted to ICE—his jailer. Predictably, ICE has denied each request, even after J.M.A.'s criminal charge had been dismissed. But due process requires a neutral adjudicator. *See, e.g.*, *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 239 (W.D.N.Y. 2019) (finding "detention could not continue without close scrutiny by a neutral decisionmaker."). These procedures—in which J.M.A. must justify his release to ICE rather than ICE justify his detention to a neutral decisionmaker—are wholly insufficient to safeguard against an erroneous deprivation of his liberty interests through his unreasonable and prolonged detention. *See Black*, 103 F.4th at 152 (finding lack of "procedural protections . . .

markedly increase[s] the risk of an erroneous deprivation of Petitioner['s] private liberty interests"). Moreover, "[t]here is no administrative mechanism by which [J.M.A.] could have challenged his detention on the ground that it reached an unreasonable length." *Velasco Lopez*, 978 F.3d at 852.

52.    To protect against a continued erroneous deprivation of J.M.A.'s liberty, he, like other noncitizens subject to prolonged detention, "must receive an individualized bond hearing at which the government bears the burden of proving, by clear and convincing evidence, that he poses a danger to the community or a flight risk. And at that hearing, a neutral decisionmaker must consider whether alternatives to detention can reasonably address the government's interest in his continuing detention." *Cantor v. Freden*, 761 F. Supp. 3d 630, 632 (W.D.N.Y. 2025).

***The Public's Interest is Served by Ensuring J.M.A.'s Detention is Necessary.***

53.    The third *Mathews* factor—the public interest—also weighs in J.M.A.'s favor. The Second Circuit has twice held that the government failed to identify an interest in the prolonged detention of noncitizens who are neither dangerous nor flight risks. *Velasco Lopez*, 978 F.3d at 854; *Black*, 103 F.4th at 154. "On the contrary, shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Velasco Lopez*, 978 F.3d at 854; *see also Black*, 103 F.4th at 154 (same). As in *Black*, the additional process sought here would "do nothing to undercut" the government's legitimate interests in preventing flight and danger. 103 F.4th at 153. And the "minimal" administrative and fiscal burdens on the immigration system would "likely be outweighed by costs saved by reducing unnecessary detention." *Id.* at 154-55.

54.    "Where the noncitizen poses no danger and is not a flight risk, all the government does in requiring detention is separate families and remove from the community breadwinners,

caregivers, parents, siblings and employees." *Id*. (cleaned up) (quoting *Velasco Lopez*, 978 F.3d at 855). Moreover, because J.M.A. is likely to obtain status either through his asylum claim or his CAA application, and therefore unlikely to be removed at all, the public interest is not served by his ongoing detention. Both DHS and the immigration court acknowledged as much when they moved to dismiss and dismissed, respectively, his removal proceedings in October of 2024. His continued detention and the litigation it has necessitated are a waste of government resources when J.M.A. has two viable pathways to relief from removal and is neither a danger nor risk of flight.

***This Court should Release J.M.A. or, in the Alternative, Conduct a Bond Hearing***

55.     Because all three factors weigh heavily in J.M.A.'s favor, this Court should find that J.M.A.'s ongoing detention is unconstitutional and order the government to release him. In the alternative, this Court should itself conduct a prompt hearing where the government has the burden of showing that J.M.A.'s prolonged detention is justified due to a risk of flight or suspected danger to the community and that any such risk cannot be mitigated by an alternative to detention.

56.     Such relief is necessary and appropriate because the Court will already have the relevant evidence before it and because a custody hearing before an immigration judge would inadequately safeguard against the erroneous deprivation of J.M.A.'s liberty. *See, e.g.*, *L.G.M. v. LaRocco*, No. 2:25-CV-2631, 2025 WL 2092027, *4-5 (E.D.N.Y. June 25, 2025) (granting a habeas petition filed by a noncitizen in immigration detention and conducting a bond hearing). First, "[t]he sudden and precipitous rise in removal cases, and the strain they are creating on the immigration system" cast doubt on how "expeditiously and effectively an IJ will be able to hold a bond hearing in this matter." *Id.* Moreover, such a delegation might "easily require more oversight by the Court or more protracted proceedings, such as another hearing challenging the adequacy of the bond hearing, thereby further eroding any efficiency argument." *Id.* Finally, even if granted

bond, the government may appeal that decision and unilaterally invoke a regulatory automatic stay of the bond, pending the many months the BIA takes to issue a decision. *See* 8 C.F.R. § 1003.19(i)(2) (stating where "DHS has determined that an alien should not be released or has set a bond of $10,000 or more, any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination").

57.    DHS has recently invoked this automatic stay regulation in a growing number of cases to deny noncitizens release after an immigration judge granted a bond, requiring them to seek relief from federal courts. *See, e.g.*, Molly Ashford, *Nebraska Judge says three people in ICE detention were wrongfully detained after bond determination, more remain imprisoned*, Neb. Pub. Broad. (Sept. 3, 2025 6:00 PM), https://nebraskapublicmedia.org/en/news/news-articles/nebraska-judge-says-three-people-in-ice-detention-were-wrongfully-detained-after-bond-determination-more-remain-imprisoned/; *Anicasio v. Kramer*, No. 25-CV-3158, 2025 WL 2374224, at *5 (D. Neb. Aug. 14, 2025) (ordering the release of a noncitizen detained pursuant to the automatic stay regulation because the detention "violate[d] her due process rights and is ultra vires of the authority delegated in the Immigration and Nationality Act"); *Maldonado v. Olson*, No. 25-CV-3142, 2025 WL 2374411, at *2, *16 (D. Minn. Aug. 15, 2025) (ordering release and enjoining enforcement of the automatic stay provision of 8 C.F.R. § 1003.19(i)(2)); *Leal-Hernandez v. Noem*, No. 1:25-CV-02428, 2025 WL 2430025, at *4, *15 (D. Md. Aug. 24, 2025) (ordering the release from immigration detention of a noncitizen who had been granted bond by an IJ but who remained in detention because "the Government filed an appeal effectuating an automatic stay of the IJ's order"); *Herrera Torralba, et al., v. Knight*, No. 2:25-CV-01366, 2025 WL 2581792, at *1 (D. Nev. Sept. 5, 2025) (ordering the release of three noncitizens detained pursuant to the automatic

stay provision of 8 C.F.R. § 1003.19(i)(2)); *Elizaldo Sampiao v. Hyde*, No. 1:25-CV-11981, 2025 WL 2607924, 1t *2 (D. Mass. Sept. 9, 2025) (ordering the release of a noncitizen granted bond by an IJ but detained pursuant to the automatic stay provisions of 8 C.F.R. § 1003.19(i)(2)).

## JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2241 (habeas corpus).

59.     Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this district. Venue is also proper under 28 U.S.C. § 2241(d) because J.M.A. is detained at a facility within this district.

60.     Administrative exhaustion is unnecessary because it would be futile.

## CAUSE OF ACTION

### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Detention Without Sufficient Process)

61.     J.M.A. repeats and re-alleges the allegations contained in all preceding paragraphs of this Petition-Complaint as if fully set forth herein.

62.     J.M.A. is not a flight risk nor a danger to his community. Respondents' prolonged detention of J.M.A. is therefore unjustified and unlawful. Accordingly, J.M.A. is being detained in violation of his constitutional right to Due Process under the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, the petitioner respectfully requests that this Court:

1) Assume jurisdiction over this matter;

2) Enjoin the Respondents from transferring the Petitioner away from the jurisdiction of this District pending these proceedings;

3) Declare that the Petitioner's arrest and detention violate the Due Process Clause of the Fifth Amendment;

4) Issue a Writ of Habeas Corpus ordering Respondents to immediately release the Petitioner from custody;

5) Award the Petitioner reasonable attorneys' fees and costs for this action under the Equal Access to Justice Act, 28 U.S.C. § 2414; and

6) Grant the Petitioner any other relief this Court deems just and proper.

Dated: September 16, 2025
    New York, N.Y.

Respectfully submitted,

/s/ Sarah T. Gillman
Sarah T. Gillman
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine Street, Ste. 801
New York, NY 10005
(646) 289-5593
gillman@rfkhumanrights.org

Sarah Decker
ROBERT F. KENNEDY HUMAN RIGHTS
1300 19th Street NW, Ste. 750
Washington, DC 20036
(646) 289-5593
decker@rfkhumanrights.org

Thomas Munson*
Amy Belsher
Robert Hodgson
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, Floor 19
New York, New York 10004
(212) 607-3300
tmunson@nyclu.org

*Application for admission to WDNY pending

Attorneys for Petitioner

## VERIFICATION

I am submitting this verification on behalf of the Petitioner because I am one of the

Petitioner's attorneys. I have discussed with the Petitioner the events described in this Petition.

On the basis of those discussions, I hereby verify that the statements made in this Petition and

Complaint are true and correct to the best of my knowledge.

Dated: September 16, 2025                             _/s/ Sarah T. Gillman_
       New York, N.Y.                                Sarah T. Gillman
                                          ROBERT F. KENNEDY HUMAN RIGHTS
                                          88 Pine Street, Ste. 801
                                          New York, NY 10005
                                          (646) 289-5593
                                          gillman@rfkhumanrights.org

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| J.M.A. | See attachment. |

| (b) County of Residence of First Listed Plaintiff    Erie | County of Residence of First Listed Defendant    Erie |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| See attachment. | U.S. Attorney's Office, Western District of New York<br>138 Delaware Avenue, Buffalo, NY 14202 |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
    Plaintiff

☐ 3  Federal Question
    *(U.S. Government Not a Party)*

☒ 2  U.S. Government
    Defendant

☐ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*            *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers'<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal<br>  Injury<br>☐ 362 Personal Injury -<br>  Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>  Product Liability<br>☐ 367 Health Care/<br>  Pharmaceutical<br>  Personal Injury<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | ☐ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Management<br>  Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>  Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>  Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>  28 USC 157<br>**INTELLECTUAL<br>PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>  New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets<br>  Act of 2016<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>  3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 480 Consumer Credit<br>  (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer<br>  Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>  Exchange<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 445 Amer. w/Disabilities -<br>  Employment<br>☐ 446 Amer. w/Disabilities -<br>  Other<br>☐ 448 Education | **Habeas Corpus:**<br>☒ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>  Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>  Conditions of<br>  Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>  Actions | ☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS—Third Party<br>  26 USC 7609 | ☐ 895 Freedom of Information<br>  Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>  Act/Review or Appeal of<br>  Agency Decision<br>☐ 950 Constitutionality of<br>  State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
    Proceeding

☐ 2  Removed from
    State Court

☐ 3  Remanded from
    Appellate Court

☐ 4  Reinstated or
    Reopened

☐ 5  Transferred from
    Another District
    *(specify)*

☐ 6  Multidistrict
    Litigation -
    Transfer

☐ 8  Multidistrict
    Litigation -
    Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC § 2241

Brief description of cause:
Under the federal habeas statute, 28 USC § 2241, Petitioner challenges his immigration detention by the Respondents.

| VII. REQUESTED IN<br>COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION<br>UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:   ☐ Yes   ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S)<br>IF ANY | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| September 16, 2025 | /s/ Sarah Gillman |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M.A., | |
| *Petitioner*, | Case No. _____ |
| v. | **ATTACHMENT TO CIVIL COVER SHEET** |
| STEPHEN KURZDORFER, in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; JOSEPH FREDEN, in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility; TODD LYONS, in his official capacity as Acting Director U.S. Immigrations and Customs Enforcement; and KRISTI NOEM, in her official capacity as U.S. Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATIONS AND CUSTOMS ENFORCEMENT, | |
| *Respondents*. | |

## I. (a) – Defendants

Stephen Kurzdorfer; Joseph Freden; Todd Lyons; Kristi Noem; U.S. Department of Homeland Security; U.S. Immigrations and Customs Enforcement

## I.(c) – Petitioner's Attorneys

Amy Belsher
Robert Hodgson
Thomas Munson*
New York Civil Liberties Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300

*Application for admission to WDNY pending*

Sarah T. Gillman
Robert F. Kennedy Human Rights
88 Pine Street, 8th Floor, Suite 801
New York, NY 10005
(646) 289-5593

Sarah E. Decker
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(646) 289-5593